UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIE ERVIN CHADWICK,

Petitioner,

v.

RICK HILL, Warden

Respondent.

No.  2:20-cv-01264 WBS GGH

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(c).

Petitioner was convicted, *inter alia*, of assault likely to inflict great bodily injury, and the infliction of great bodily injury. The victim was a distraught mother of petitioner's ex-girlfriend—distraught because she believed petitioner had inflicted injury on her daughter. Petitioner mounted a self-defense theory at trial.  However, once his counsel scored a "victory" in securing a jury instruction that presumed one was acting in self-defense in confronting an intruder who had forcefully/violently entered that resident's dwelling, she was faced with a Hobson's

1

1   choice: arguing only the thin reed of evidence showing that the victim entered petitioner's house

2   in a violent (as opposed to just simply angry) fashion, or advising her client to testify despite a

3   previous, probably devastating, conviction for domestic abuse which was sure to be put before the

4   jury for impeachment purposes.  Picking the best of what must have appeared to her as bad

5   options, she advised her client not to testify.  Petitioner did not testify and now asserts that her

6   choice constituted ineffective assistance of counsel.

7        After review of the record and applicable legal standards, the undersigned finds counsel's

8   choice, upheld by the state courts, was not unreasonable under the Antiterrorism and Effective

9   Death Penalty Act of 1996 Standards ("AEDPA").

10  *Background Facts*

11       Because there is no appellate recitation of the facts, see *Procedural Facts* below, the

12  undersigned sets out those trial facts given by petitioner in the current habeas petition.  No slight

13  is intended to respondent as the essential facts set forth in the answer are essentially the same

14  facts as given in the petition.  However, because the "defense Case" set forth by respondent is a

15  bit more descriptive, that is replicated here as well.

16       Petitioner's summary of the facts are provided below:

17                        **A. Background**

18       Mr. Chadwick lived at 1970 Grande Circle, apartment 25, in
    Fairfield. Ex. C[1] at pp. 292, 390, 443. Within the same complex,
19  Regina Stoyanovsky's apartment was at 1910 Grande Circle, where
    the parking lot was a local hangout. *Id.* at pp. 138, 156, 287, 289,
20  292, 366. Regina, who suffers from bipolar disorder, received
    disability payments as well as parental support.[2] *Id.* at pp. 138-141.
21  From around 2013-2016, Mr. Chadwick was Regina's boyfriend
    and sometimes lived at her place. *Id.* at pp. 142-145. Adrienne
22  Duckett[3] was the mother and co-parent of Mr. Chadwick's
    daughter; Duckett lived at his apartment until September 2016. *Id.*
23  at pp. 442-443, 459-460.

24  _____

25  [1] [Fn. 14 in original text] "Ex. C" refers to Reporter's Transcript of Proceedings on April 10, 11,
    and 12, 2017 (jury trial testimony), prepared for purposes of the new trial motion.
26  [2] [Fn. 15 in original text] To avoid confusion, Mr. Chadwick refers to Regina, Lina, and Rachel
    Stoyanovsky by their first names. Although Regina was mentioned in testimony, she did not
27  testify.
    [3] [Fn. 16 in original text] Duckett had been convicted of receiving stolen property. Ex. C at p.
28  484.

                                      2

Regina's mother Lina was initially happy about Mr. Chadwick being in her daughter's life; however, within about six months of the relationship she began seeing bruising on Regina's face and drugs and damaged furniture at the apartment. After that she disliked him. Ex. C at pp. 142-146, 222. At some point Regina called the police at her mother's urging, and Lina wrote to the district attorney, seeking prosecution of Mr. Chadwick. *Id.* at p. 147. On several occasions, Lina told Mr. Chadwick to leave Regina alone, but he responded, "Fuck you and your daughter." *Id.* at pp. 151-152. By late May 2016, Regina and Mr. Chadwick were no longer in a dating relationship. Id. at p. 221.

## B. The Charged Crimes: May 27, 2016

### 1. Lina's Account

Concerned about Regina, on the morning of May 27 Lina went over to her apartment. Regina's face appeared to be bruised and swollen. Ex. C at pp. 148-150, 195-196. Lina asked if "he" did this to her. Regina said no, then explained the injuries resulted from her falling off a bicycle. *Id.* at pp. 150, 194-195. Because Regina did not have a bicycle and could not ride one, Lina did not believe her and felt she was covering for Mr. Chadwick.[4] *Id.* at pp. 150, 194-195. When Lina called Regina a liar, she shut the door in Lina's face. *Id.* at pp. 70-71, 115, 139-140, 164. Feeling angry and helpless, Lina then drove to Mr. Chadwick's place, planning to tell him again to leave Regina alone. *Id.* at pp. 72-76, 115-116; see also pp. 118, 168-169 [at preliminary hearing, Lina testified that she "snapped" and wanted to hit him].

According to Lina, seeing Mr. Chadwick outside his open front door, Lina parked on the street and walked quickly to his apartment as he entered. Ex. C at pp. 76-78, 119. She followed through the still-open door to confront him, taking from one to a few steps inside. *Id.* at pp. 80-81, 119-120, 123-124, 165, 185. Mr. Chadwick was around four feet from the door and, although it was dark inside, Lina could see ten or more people in the living room, many of who appeared to be sleeping. *Id.* at pp. 81, 84, 108, 162, 167. Without threatening or raising a hand toward Mr. Chadwick, Lina, upset and crying, yelled at him, "Please leave my daughter alone!" *Id.* at pp. 80-83, 120-121, 142, 169, 185. Mr. Chadwick said, "What the fuck?" and punched her once in the face, knocking her glasses off and causing her to hit her head against the door. *Id.* at pp. 81-84, 122, 125, 185. Lina returned to her car and called 911. *Id.* at pp. 85, 89-90, 106-107, 126, 198. Mr. Chadwick stayed inside and shut the door. Id. at pp. 602, 637-638.

Six officers arrived a little after 10 a.m., by the end of Lina's call. She was crying and upset, and her face looked like it

---

[4] [Fn. 17 in original text] Duckett testified about the previous day, when she had seen Regina outside Mr. Chadwick's apartment: Regina was sitting on the ground next to a bicycle, looking shocked and holding her mouth; her lip was bruised. She said she had tripped over the bike. Ex. C at pp. 451-452, 472-473.

was beginning to bruise. They told her she should take an ambulance to the hospital, but she declined to do so because her dog was in the car. Ex. C at pp. 90-93, 176-179, 415. Officer Kevin Anderson went to Mr. Chadwick's apartment, repeatedly knocked on the door, and announced his presence through a broken window, but there was no response. *Id.* at pp. 179-180. Officer Michelle Belyea watched Mr. Chadwick's back gate for around twenty minutes. *Id.* at pp. 414-415. In the meantime, Lina called her son, who drove her to the hospital. Her pain felt like a seven on a scale of zero to ten, but no surgery was required. *Id.* at pp. 93-95, 164. Her facial injuries were noted by Officer Kevin Anderson, *id.* at pp. 179, 182, and photographed, *id.* at pp. 113, 148. Lina's husband, Leonig Volodarsky, and her other daughter, Rachel, saw her later that day and noted significant bruising and swelling around Lina's nose and eye. *Id.* at pp. 27-30, 95-97, 146-148.

## 2. Defense Account

Four of Mr. Chadwick's friends who were in his apartment that morning offered a different account of Lina's conduct preceding the incident. Sammie Scott recalled that folks were playing dice and cards downstairs, while Mr. Chadwick was upstairs taking a shower. Lina suddenly entered, looking angry. She briefly talked to a few people, then stormed upstairs. Scott could hear footsteps stomping there. Lina came back down, paused, and left. Moments later Mr. Chadwick came downstairs wearing a towel. Ex. C at pp. 222-229, 234-238. Scott was there for another hour but did not hear police outside. *Id.* at pp. 226, 238-239.

Through the kitchen window, Jimmy Henning saw a woman walking quickly up to the apartment. Stone-faced, she entered through the open door, continued through the hallway, and went upstairs. Henning did not hear anything from upstairs, but he had the kitchen water running. Within a minute the woman came back downstairs and left. Mr. Chadwick then came down, half-dressed, as if he had just woken up. Ex. C at pp. 305-316, 319-320. Henning left around five minutes later. He did not see or hear police. *Id.* at pp. 316, 321-322; but see *id.* at pp. 416-418 (Officer Michelle Belyea contacted Henning in the area behind the apartment).

From the back patio, Marcus Johnson[5] heard loud yelling and cursing and saw Lina wildly raging inside. She yelled upstairs, then went up there, still cursing loudly. A minute or so later she returned and left the apartment. At some point Johnson heard what sounded like something getting knocked over. He stayed out on the patio for another hour, then went inside for a little while before leaving. Ex. C at pp. 259-265, 266, 272-277. While at the apartment, Johnson neither heard nor saw police. *Id.* at pp. 265, 278.

From the back patio, Adrienne Duckett did not notice any

---

[5] [Fn. 18 in original text] Johnson had been convicted of car and identity theft and false impersonation. *Id.* at p. 278.

4

disturbance, but when she went inside she heard loud footsteps and a commotion upstairs. Suddenly an angry Lina hurried downstairs, yelling to Mr. Chadwick that he would pay for what he did, and that she would call police. Lina left, then Mr. Chadwick came down wearing shorts or a towel, also angry. Ex. C at pp. 358-363, 380-382. Duckett left through the back a few minutes later, then returned after a half-hour. Henning and Mr. Chadwick were gone, but Scott, Johnson, and some other people were still inside. Duckett did not see any officers, but her friend Black said police had been there. *Id.* at pp. 363-365, 383-385.

## C. Between Incidents

Lina's swelling lasted for a couple weeks. The bruising lasted for a month or so. Some cheek pain continued through trial. Ex. C at pp. 30, 97-98, 148.

When visiting Regina between May and October, Lina saw Mr. Chadwick several times at some distance. He could see her, too, but they had no contact. Ex. C at pp. 100, 105. On June 9, with her face still bruised and swollen, Lina went to the police station and asked why Mr. Chadwick had not been arrested yet. *Id.* at pp. 98-99, 110-112, 182-183.

At Mr. Chadwick's first court appearance in this case on October 11, Lina requested and the court issued a criminal protective order against him. Ex. C at pp. 100, 157, 433.

## D. The Uncharged Incident: October 16, 2016

On October 16, Lina, Rachel, and Volodarsky went to Regina's apartment. On the way through the parking lot, they saw Mr. Chadwick and some other people talking and playing dice. Ex. C at pp. 31-32, 42-43, 101-103, 105, 127-128, 133-137, 148-149, 153-154, 156-157. Regina's family went inside her apartment, leaving the main door open but the screen door closed. *Id.* at pp. 103, 129, 150.

According to Lina, at one point she saw Mr. Chadwick outside, around four feet away. He smiled, made throat-cutting gestures, and pointed at her, then turned and walked away. Ex. C at pp. 103-104, 129-130. Volodarsky saw Mr. Chadwick heading away grinning, a few steps from door. His wife appeared shaken, and told him Mr. Chadwick had pointed his finger at her, simulating a gun.[6] *Id.* at pp. 150-153, 155-156. They called the police and produced the protective order. Officers then arrested Mr. Chadwick for violating the restraining order. Id. at pp. 105-106, 131, 152, 203-210. He said he had not been served with an order and had no idea he was not supposed to be there. Id. at p. 201.

[6] [Fn. 19 in original text] At the preliminary hearing, five days after this incident, Rachel testified only that while inside she saw Mr. Chadwick near the door, Ex. C at pp 36-37, 43; but at trial she recalled him making a throat-cutting gesture toward Lina, *id.* at pp 34, 37, 41.

5

Mr. Chadwick's and Regina's friend, Tina Badger, lived in the apartment next to Regina. She and Adrienne Duckett were out in front during this incident and saw Mr. Chadwick in the parking lot before and at the time of the arrest. He never approached Regina's place and made no threatening gestures. *Id.* at pp. 280-287, 291-296, 366-369, 387-393.

ECF No. 1 at 11-16.

A portion of respondent's summary of the facts are provided below:

### *The Defense Case*

Defense witnesses who were in petitioner's residence at the time saw Lina angrily walk into the house and go upstairs, from which they heard a "commotion," but did not claim to have seen petitioner strike Lina. Sammie Scott testified that Lina came into the apartment with an "attitude" and that she "stormed upstairs." He then heard "footsteps running like somebody pushing." RT 734-36, 747-49.

Marcus Johnson testified that he heard Lina cursing and "really wild." RT 770-73, 783, 785-87. Johnson saw Lina go upstairs and heard her say "MF", "bastard," and "asshole." RT 773-74, 783; *see* RT 785-86. Lina then came downstairs and left. RT 774, 786-87. He stated that she "was in a rage, wild animalistic. You could tell she needed some medication to calm down or something." RT 777, 785. Johnson did not see what happened upstairs. RT 777. He "heard stuff getting knocked over." RT 784-85.

Jimmy Henning testified that when Lina entered the residence "she never broke stride," walked past him, did not say anything to anyone and went upstairs. RT 820-21. He did not hear anything from upstairs, and she came down less than a minute later. RT 820-21.

Adrienne Duckett, the mother of petitioner's daughter (RT 867), stated that she heard a commotion upstairs after Lina entered, but did not hear an argument or a fight. RT 890-91. She had previously obtained an Emergency Protective Order against petitioner, and stated that her mother convinced her to obtain it. RT 884-87. She had also rammed her car into Lina's car and told the police that she had done so because she was trying to get away from petitioner, but claimed at trial that her statement to the police was a lie. RT 885-87.

Petitioner did not testify.

ECF No. 10-1 at 9-10.

////

////

1

*Procedural Facts*

2     The procedural facts pertinent to this habeas action commence with the jury instructions

3 given in the case upon which trial counsel relied in determining that petitioner should not testify:

> 4    The law presumes that the defendant reasonably feared imminent
> death or great bodily injury to himself or a member of his family or
> 5    household if: One, *an intruder unlawfully and forcibly entered* or
> was entering the defendant's home; two, the defendant knew or
> 6    reasonably believed that an intruder unlawfully and forcibly entered
> or was entering the defendant's home; three, the intruder was not a
> 7    member of the defendant's household or family; and four, the
> defendant used force attendant to or likely to cause death or great
> 8    bodily injury to the intruder inside the home.
>
> 9                                    ***
>
> 10   The People have the burden of overcoming this presumption. This
> means that the People must prove that the defendant did not have a
> 11   reasonable fear of imminent death or injury to himself or to a
> member of his family or household when he used force against the
> 12   intruder. If the People have not met this burden, you must find the
> defendant reasonably feared death or injury to himself or for a
> 13   member of his family or of his or her -- or to a member of his or
> her family or household.
> 14
> Forcible entry involves some show of strength, such as the breaking
> 15   of doors or windows, or with use of a weapon, *or by threats,
> menace, or some other type of violence or terror.*
> 16

17 ECF No. 11-14 at 93 (CALCRIM Nos. 3477 and 3160 (emphasis added)).

18     However, petitioner was convicted of assault by means likely to inflict great bodily

19 injury, and misdemeanor battery, a lesser included offense of battery with serious bodily injury,

20 as well as an enhancement on the assault count for great bodily injury.[7] In this case, petitioner

21 had other felony charges pending so that an agreement was reached that, after no contest pleas,

22 the sentences in these other felonies would run concurrent with his sentence in the instant case.

23 Petitioner was ultimately sentenced to an aggregate term of 16 years with a one-strike finding.

24 ////

---

25   [7] The verdict containing an enhancement for actual great bodily injury is somewhat confusing vis-
à-vis the non-finding of serious bodily injury on the battery counts as the terms "great bodily
26 injury" and "serious bodily injury" and are essentially equivalent in California law. See People v.
Burroughs, 35 Cal. 3d 824, 831 (1984); People v. Well, 204 Cal. App. 4th 1142, 1149-50 (2012);
27 but see People v. Taylor, 118 Cal. App 4th 11, 22-24 (2004). But this possible inconsistency
shall remain undeveloped as no issue in this habeas action involves such.
28

1    Although a waiver of appeal in this case was part of the sentence bargain, petitioner

2  appealed anyway, but the appellate court gave short shrift to the appeal. People v. Chadwick, No.

3  A152767, 2018 WL 4479331 (Cal. Ct. App. Sept. 19, 2018)

4    A state habeas action was filed with the Superior Court raising an ineffective assistance of

5  counsel claim for counsel's advice to petitioner not to testify. The evidence filed there

6  (declarations of petitioner and petitioner's counsel Christine Start), are important in that these

7  filings, along with the trial record, constitutes the record for AEDPA purposes. Cullen v.

8  Pinholster, 563 U.S. 170, 186, 187 (2011).[8] The declarations are set forth at length in pertinent

9  part below:

10                    **DECLARATION OF CHRISTINE M. START, ESQ.**

11          […]

12          3. Mr. Chadwick's primary defense at trial was self-defense. The
   basic factual basis for this defense was that Lina Stoyanovsky had
13         entered Mr. Chadwick's residence without permission, and either hit
   him or was about to hit him, and that he hit her in self-defense.
14

15         4. Prior to trial, Mr. Chadwick and I had several discussions about
   whether he should testify or not. I can't remember exactly how
16         many discussions we had but was it more than one [sic]. I do not
   recall Mr. Chadwick expressing strong feelings one way or the
17         other about testifying.

18         5. At the beginning of trial, it was still up in the air as to whether
   Mr. Chadwick would testify. At some point during the trial, but
19         prior to the conclusion of the evidence, the judge granted my
   request that he would give the jury the instruction contained in
20         CALCRIM 3477, which permitted the jury to presume Mr.
   Chadwick was reasonably afraid of death or great bodily injury
21         when faced with an intruder (Lina Stoyanovsky) into his home.
   Before making a final decision on whether Mr. Chadwick should
22         testify or not, I put Mr. Chadwick through a practice direct and
   cross-examination. When I put him through a practice cross-
23         examination, I recall being concerned that Mr. Chadwick might
   come across to the jury as being angry at, rather than in fear of, Ms.
24         Stoyanovsky for entering his home and responding the way he did.
   Given my concern from the practice examination, the fact that the
25         trial court was going to give instruction CalCrim 3477, and, if 1
   recall correctly, that Mr. Chadwick had a prior "strike" conviction
26         that the jury would hear about if he testified (but would not if he did

27  ───────────────
   [8] Only if the federal court determined the outcome of the state courts to be AEDPA unreasonable
28  would the federal courts then be able to marshal appropriate evidence at an evidentiary hearing.
   Gulbrandson v. Ryan, 738 F.3d 976, 987 (9th Cir. 2013).

not testify), I advised Mr. Chadwick that in my opinion that it was not in his best interests to testify, and that the evidence presented at trial was sufficient to allow the jury to acquit Mr. Chadwick based on CALCRIM 3477. My recollection is that Mr. Chadwick was in agreement with my advice that he not testify.

ECF No. 11-15 at 45-46.

## DECLARATION OF WILLIE CHADWICK

[…]

2. My defense at trial was self-defense. Lina Stoyanovsky entered my home, walked upstairs and into my bedroom, and slapped me. I reacted instinctively by hitting her back.

3. After the last witness testified at the trial, Ms. Start and I discussed whether I should testify. She advised me that it was not in my best interests to testify and told me it was not necessary that I testify to be acquitted. She told me, "I got this."

4. I was planning to testify and wanted to testify at my trial. I chose not to testify based solely on Ms. Start's advice that it was not in my best interests to do so. Had I known that it was necessary that I testify to support my claim of self-defense, I would have testified.

ECF No. 11-15 at 48.

The Superior Court issued the following order denying the petition:

Petitioner has not stated a prima facie case for relief. (*People v. Duval* (1995) 9 Cal.4th 464, 474-475.) Petitioner has neither demonstrated that his trial counsel's advice not to testify fell below an objective standard of reasonableness, given the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance, nor that he was prejudiced by the alleged deficient performance by counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696; *In re Alvernaz* (1992) 2 Cal.4th 924, 936.) "Advising a client not to testify does not in and of itself constitute inadequate trial assistance' and cannot reverse a conviction if the advice resulted from an informed tactical choice within the range of reasonable competence. (*People v. Trotter* (1984) 160 Cal.App.3d 1217, 1224-1225; see, *People v. Lucas* (1995) 12 Cal.4th 415, 444 [whether or not counsel advised a defendant to take the stand goes to the heart of trial tactics, which would rarely support a claim of ineffective assistance]; *People v. Pope* ( 1979) 23 Cal.3d 412, 425 [ conviction must be affirmed if the record shows that counsel's actions or omissions resulted from an informed tactical choice]; *People v. Frye* (1998) 18 Cal.4th 894,979-989 [conviction may be reversed only if the record affirmatively discloses that counsel had no rational tactical purpose for the act or omission].)

Counsel's advice to Defendant that he not testify was reasonable, the advice having been given after more than one

9

discussion of the issue, a practice direct and cross examination in which Petitioner came across as angry, and the fact that Petitioner had a prior robbery conviction which could be used to impeach Petitioner on cross-examination. (Decl. of Start, ¶¶ 4-5.)

Similarly, counsel's strategy to argue CalCrim 3477 was reasonable where witness Sammie Scott testified that the victim came into the house frowning, with an attitude, stomping upstairs. (RT 223: 14 - 224:9) Mr. Scott explained, "She stormed upstairs." (RT 224:9) Mr. Scott went on to describe, "All I heard were footsteps running like somebody pushing. They stomp like that. (Indicating)." (RT 224:23-25). Witness Marcus Johnson testified that the victim entered the home "cursing," "talking over five or six people, so it had to be loud," "yelling," using the words 'MF bastard, asshole."(RT260:19-264:5). Witness Jimmy Hennings testified that the victim"[...] never broke stride. She walked - made a left turn up the walkway and walked. She just kept going past me and up the stairs." (RT 310:25-28).

On cross examination, the victim conceded:

1.    Having snapped, wanting to scream at and hit the Petitioner. being very angry. (RT 118: 15-17).

2. Running out of her car, coming close to the Petitioner, stepping into his house, before she was punched. (RT 120: 13-21).

3. Screaming or speaking loud. (RT 120:22-24).

When discussing instruction 3477, the trial court agreed with trial counsel, explaining: " [...]Ms. Start makes a point: That when she goes in there yelling, they may decide that that's forcible entry." (RT 444: 17-20). The Court went on to give a special instruction defining forcible entry as "[ ... ] involves some show of strength such as breaking of doors or windows or the use of a weapon or by threats, menace, or some other type of violence or terror." (RT 448:5-9). This Court finds that trial counsel had a sufficient factual basis to argue instruction 3477 and made an objectively reasonable tactical decision to avoid the risks of putting her client on the witness stand.

Even if the Court found counsel's performance was deficient, there is no reasonable likelihood that Petitioner would have obtained a more favorable outcome had he testified. Any testimony by Petitioner would have been subjected to cross-examination, resulting in the introduction of Petitioner's prior felony conviction at the guilt phase. Based on his poor performance during defense counsel's mock examination, Petitioner ran the risk of appearing angry, certainly an unfavorable impression for a self-defense claim. Petitioner states in his declaration that he instinctively struck the victim only after being "slapped" first.

Petitioner's claim would have been challenged in light of no witness testimony of observed injuries or redness on Petitioner, and

no testimony from witnesses that Petitioner was distraught, upon coming down the stairs, as if he had been physically assaulted. Further, in light of the significant injuries to the victim's face, Petitioner would have had an uphill battle as to element three of the self-defense instruction, specifically, that he used no more force than reasonably necessary to defend against the danger. The victim's daughter, Rachael Stoyanovsky, described the victim's injuries as significant bruising and swelling around the nose. eye, bridge of the nose, and underneath the eye socket. (RT 28:2-5). The swelling lasted up to two weeks and bruising lasted up to four weeks. (RT 29:24-30-3). The victim's husband, Leonig Volodarsky, also described seeing the victim's facial swelling and bruising and took pictures of the injuries. (RT 146:14 - 148:16).

As such, the Court finds that trial counsel's performance did not fall below an objective standard of reasonableness. Even if counsel erred in advising Petitioner not to testify, there is no reasonable likelihood of a different outcome, even if Petitioner had testified.

ECF No. 11-15 at 66-68.

Petitions to the appellate court and California Supreme Court were summarily denied.

*Discussion*

This is a case governed by the Antiterrorism and Effective Death Penalty Act of 1996 Standards. Because the last explained state court decision was that of the Superior Court, the higher courts are presumed to have based their decision on the lower court's reasoning. Wilson v. Sellers, 138 S.Ct. 1188, 1192 (2018).

The federal standards for ineffective assistance of counsel in an AEDPA setting are well stated in Cullen v. Pinholster, supra, 563 U.S. at 189-190:

There is no dispute that the clearly established federal law here is *Strickland v. Washington.* In *Strickland*, this Court made clear that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*, at 686, 104 S.Ct. 2052 (emphasis added). The Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.

Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," ibid., the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.*, at 690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.*, at 688, 104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id.*, at 690, 104 S.Ct. 2052.

The Court also required that defendants prove prejudice. *Id.*, at 691–692, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, supra, at 112, 131 S.Ct., at 791.

Our review of the California Supreme Court's decision is thus "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1413, 173 L.Ed.2d 251 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) ). We take a "highly deferential" look at counsel's performance, *Strickland, supra*, at 689, 104 S.Ct. 2052, through the "deferential lens of § 2254(d)," *Mirzayance, supra*, at 121, n. 2, 129 S.Ct., at 1419, n. 2. Pinholster must demonstrate that it was necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the jury's sentence of death.

Defense trial counsel in this case determined to forego having petitioner testify and to rely on the instructions.  Thus, petitioner's counsel in this habeas case must demonstrate that reasonable counsel would not have chosen to rely on the jury instruction; that testimony by petitioner was essential, and that the California courts were AEDPA unreasonable in finding otherwise. The ultimate focus in this case is on the latter point.

Petitioner strongly argues that trial counsel "promised" petitioner's testimony in opening statement and that there was no (substantial) evidence that the complainant made a forceful entry into petitioner's house.  There is some merit to petitioner's arguments.  While not naming petitioner per se, trial counsel did expressly inform the jury that evidence would be forthcoming that the complainant (Lina) slapped petitioner, and that petitioner simply instinctively reacted when he punched Lina.  ECF No. 1-7 at 31.  Counsel had to know from investigation, that no

1    witness besides petitioner directly observed the interaction between himself and Lina.  Therefore,

2    she made a statement which would require petitioner's testimony.[9]  Trial counsel knew that she

3    needed such testimony as she attempted to "sneak it in," in final argument, but was caught in the

4    act.  ECF No. 11-14 at 39.  And, direct evidence of Lina striking petitioner would give petitioner

5    a leg up on any self-defense assertion.

6        Petitioner's habeas counsel also has a point in claiming that the evidence of forceful entry

7    was thin. As set forth in the summation of the witness testimony, the best that can be said is that

8    Lina entered into the house in an aggressive fashion and that witnesses heard a commotion,

9    profanity and screaming.  There was, however, no evidence of Lina's even pushing, or smashing

10   something when she entered.  Lina was angry enough to slap petitioner, but there was no

11   evidence that she ever did.  Something was needed to justify the hard punch to Lina's face, and

12   the only thing the jury heard in the way of direct evidence was contrary to petitioner's non-

13   testified to theory, i.e., Lina's testimony—an exclamation by petitioner when he was surprised by

14   Lina's presence, and then the very hurtful punch.

15       Finally, it was not an "either-or" situation.  That is, trial counsel could have argued, along

16   with petitioner's testimony, both the presumption and her client's testimony. However, trial

17   counsel's sole reliance on the jury instruction in lieu of petitioner's testimony was not bereft of

18   reason.  First, even the trial judge thought it had a shot.

19       *On 3477, Mr. Roberts, you are right that you need both unlawful*
         *and forcible entry, but Ms. Start makes a point: That when she goes*
20       *in there yelling, they may decide that that's forcible entry.*

21   ECF No. 11-13 at 29 (RT 444) (emphasis added).[10]

22       The Start's declaration, as viewed by the Superior Court on habeas, also attested to the

23   fact that petitioner, after a trial run, was a poor witness—one that was easily rattled into becoming

24   hostile.  Furthermore, regardless of a general hostile demeanor, petitioner's prior domestic abuse

---

[9] Petitioner cites to cases, for the most part, in which counsel expressly stated that the defendant
would testify. Such was not dome here, and the jury would not have known at the time of opening
statements who precisely would testify and to what.

[10] The undersigned does not agree with petitioner's habeas counsel that "entry" begins and ends at
the threshold of the residence.  Entry can be characterized by actions just prior to, and just after
entering.

13

1  conviction, as well as other violent crimes, was bound to significantly influence the jury's

2  perception of petitioner's credibility.[11]  Finally, it is quite evident that trial counsel desired to

3  wind the jury around an instruction that was presumptive in nature, giving the jury little room to

4  find that the prosecution had rebutted the presumption.

5          Our legislature put together a specific jury instruction. It's
6  called. the homeowner's presumption, and the law presumes,
   presumes, it means, this is what the law is, and until the DA can
7  overcome this presumption, that means you have to take it; it is
   what it is, as long as the intruder unlawfully and forcibly entered or
8  was entering the defendant's home.

9          The DA is trying to say that Ms. Stoyanovsky didn't forcibly
   enter. When someone walks through your door and you are walking
10  away from them, and/or when someone walks upstairs into your
   room and in your face, that's forcible. That's forcible. It's menacing.
11  They're yelling at you and they are screaming at you.

12                               \*\*\*

13          So with regards to what I was saying about this instruction,
   it's a presumption, and it also says that the defendant knew or
14  reasonably believed that the intruder unlawfully and forcibly
   entered, or was entering the defendant's home.

15          Okay. I'm not going to argue that much with that because if
   you are in your own home and someone is in your face, I mean,
16  that's shock. He would have reasonably believed that if an intruder
   came in here, you heard the testimony that he came downstairs and
17  was asking everybody: How did she get in?

18          And then, the intruder was not a member of the defendant's
   household or family. No, she wasn't. She wasn't a member of his
19  household. She wasn't her family. She didn't ask for permission to
   come in there. She walked or stomped or strided right in, and the
20  defendant used force, intended to or likely to cause death or great
   bodily injury to the intruder inside of the home.

21
22          He used force to get the person out, and what happened?
   The person came out. One punch, one hit, not more than that. The
23  testimony is very clear as to that.

24  _____
   [11] The answer at ECF No. 10-1 at 19 lists petitioner's impeachable offenses, one of which is
25  domestic abuse.  However, the record citation does not seem to match petitioner; rather it appears
   to match a witness Scott.  However, during the motions in limine, petitioner's charged felony,
26  resolved  misdemeanor domestic abuse conviction was discussed, and the court ruled that it
   would allow in the conviction with the description posed in a question to petitioner:" Isn't it true
27  that you pushed your girlfriend into a bathroom wall, causing injuries to her back?"  ECF No. 11-
   9 at 23.  Several other crimes of moral turpitude would have been permitted for impeachment
28  purposes.

1          Now, if the People or the People must have -- sorry.

2          The People have the burden of overcoming this
presumption, and this means that the People must prove, they must
3    prove that the defendant did not have a reasonable fear of imminent
death or injury co himself or to a member of his family or
4    household when he used force against the intruder.

5          If someone you don't want in your home is in your home, by
hell, you have the right to use reasonable force against them, or
6    heaven. (Sic)

7          Now, if the People have not met this burden, you must find
the defendant reasonably feared death or injury to himself or a
8    member of his or her family or household, so if they don't prove
and meet their burden on that, automatically, you have to believe
9    that -- and give him, Mr. Chadwick, the presumption that his fear
was reasonable, that it was reasonable to fear what could happen to
10   him.

11         That's a presumption, and then with regards to self-defense,
you're also going to get that. The DA is going to talk about words,
12   probably, and words not being enough, if all you believe that was
Ms. Stoyanovsky was yelling and screaming at him, that doesn't
13   justify self-defense.

14                              ***

15         We have to remember, there's the law, and then there's all
these little extras, these biases that we have. It's the same law, and
16   it applies to everyone, and I'm glad that it does. You have the right
to stand your ground. You have the right to not retreat, and I am --
17   and now, you have the presumption that if someone comes into
your home, you reasonably, automatically, homeowner's
18   presumption, you reasonably believe that you are in fear, that's the
presumption.

19
           Even if you don't want to give it to him, you have to.
20

21   ECF No. 11-14 at 42- 45.

22         And trial counsel further urged the presumptive self-defense instruction again, at the tail

23   end of the argument:

24         I'm asking you all to pay careful attention to the self-
defense instruction because it will specifically tell you with regards
25   to self-defense, that a person is entitled to stand their ground.
They're entitled to not retreat. Where else could you retreat if you
26   are in your own home?

27         No where, because she had to retreat. She had to leave
because she was intruding. She instigated; she initiated.
28

                              15

1

2    None of this would have happened if she would have just
     did what any other reasonable person would have done in that
     circumstance. As overwhelmed and as desperate as you are, you
3    don't go into somebody else's home and pick a fight. You just don't
     do that.

4          I think I'm done; just want to be very careful.

5    ECF No. 11-14 at 52.

6          Petitioner stresses in the Petition and the Traverse that there is "no evidence" that

7    petitioner forcefully entered the house, i.e., crossed the threshold in a forceful or violent manner,

8    that she just walked in or "strided" in, so that reliance on a forceful entry jury instruction was

9    legally flawed.  It is true that there is not much evidence of the method and manner of entry other

10   than anger. However, the manner of entry is not necessarily limited to the precise instant of

11   threshold passage, and at least one court has referenced "forceful entry" as a series of acts.

12   People v. Jones, 184 Cal. App.2d 464, 469 (1960).[12]  But the more important point to be made is

13   that the court *in this case* thought there to be sufficient evidence for the giving of the instruction,

14   and petitioner's trial counsel was permitted to make the most of it before the jury—which she did.

15         The point here is that although many defense counsel would have felt it necessary for their

16   client to provide direct evidence as to what happened, i.e., the slap, perhaps along with arguing

17   the presumption, it is not necessarily ineffective assistance of counsel to be in the minority of

18   counsel.  Counsel, and more importantly, the Superior Court, could reasonably find that the

19   detriments to petitioner's testimony may have turned off the jury and squelched whatever force

20   the presumption instruction had alone.  Perhaps wrong—but AEDPA reasonable nevertheless.

21         Having found that the Superior Court (and hence the higher courts) were AEDPA

22   reasonable in rejecting petitioner's claim that counsel acted grievously below the standard

23   expected of defense counsel, the undersigned sees little point to further assess "what if" petitioner

24   had testified—the prejudice analysis.  Would the outcome have changed, or would a reasonable

25   state court have lost confidence with the fairness of the outcome?  This case involves a situation

26   where the first assessment of counsel's actions governs the prejudice inquiry as well; they overlap

27

28   [12] Take for example, a situation where an intruder crossed the threshold but immediately
     afterwards was pushing and hitting a retreating homeowner inside the home.

16

1    to a large degree.  If the court had found little excuse for counsel not placing petitioner on the

2    witness stand, e.g., there was no prior domestic abuse conviction, petitioner would have made a

3    good witness, lack of confidence in the outcome of the trial would necessarily follow. However,

4    for the reasons set forth above, petitioner's testimonial warts were quite evident. The undersigned

5    recommends this claim be denied.

6    *Conclusion*

7        A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has

8    made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The

9    certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.

10    28 U.S.C. § 2253(c)(3).

11        A certificate of appealability should be granted for any issue that petitioner can

12    demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

13    court, or is "'adequate to deserve encouragement to proceed further.'" Jennings v. Woodford, 290

14    F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

15        The undersigned believes that reasonable jurists might disagree with the outcome here,

16    and that a Certificate of Appealability should issue as to petitioner's ineffective assistance of

17    counsel claim.

18    Accordingly, IT IS HEREBY RECOMMENDED that:

19       1.   The habeas petition should be denied; and

20       2.   The District Court issue a certificate of appealability as to petitioner's ineffective

21           assistance of counsel claim.

22        These findings and recommendations are submitted to the United States District Judge

23    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

24    after being served with these findings and recommendations, any party may file written

25    objections with the court and serve a copy on all parties.  Such a document should be captioned

26    ////

27    ////

28    ////

1   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2   shall be served and filed within fourteen days after service of the objections.  The parties are

3   advised that failure to file objections within the specified time may waive the right to appeal the

4   District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5   Dated: January 25, 2021

<u>/s/ Gregory G. Hollows</u>
UNITED STATES MAGISTRATE JUDGE
